**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**HOLMES COUNTY CONSOLIDATED SCHOOL DISTRICT,
DEBRA POWELL, SUPERINTENDENT, AND
HOLMES COUNTY CONSOLIDATED SCHOOL DISTRICT
BOARD OF TRUSTEES, NAMELY LOUISE LEWIS WINTERS,
BOARD PRESIDENT, EARSIE L. SIMPSON, VICE-PRESIDENT,
AND ANTHONY ANDERSON**

**PETITIONERS**

**VS.**                                    **CAUSE NO. 3:21-cv-508-DPJ-FKB**

**MISSISSIPPI DEPARTMENT OF EDUCATION,
MISSISSIPPI STATE BOARD OF EDUCATION,
STATE COMMISSION ON SCHOOL ACCREDITATION,
ROSEMARY AULTMAN, CHAIR OF THE STATE
BOARD OF EDUCATION, PAMELA MANNERS, CHAIR OF THE
STATE COMMISSION ON SCHOOL ACCREDITATION,
DR. CAREY WRIGHT, STATE SUPERINTENDENT
OF EDUCATION, THE MISSISSIPPI STATE BOARD OF
EDUCATION AND GOVERNOR JONATHON TATE REEVES**          **RESPONDENTS**

<u>**BRIEF IN SUPPORT OF EMERGENCY PETITION FOR WRIT OF MANDAMUS**</u>

If not prohibited, Respondents will abolish[1] Petitioners -- denying them well-established property rights -- without sufficient procedural due process.  Respondents would do so -- not just to rob Petitioners of their property rights without sufficient process -- but to deny this Court an opportunity to protect Petitioners' constitutional rights *after* the Court requested briefing on Petitioners' motion for temporary injunctive relief.

More specifically, Petitioners sought to enjoin Respondents from further violating their due-process rights by filing an Emergency Verified Petition for Injunctive Relief, Declaratory

---

[1]      "Once the Governor declares a state of emergency in a school district pursuant to Section 37-17-6(11)(b) and the State Board of Education (SBE) exercises its discretionary authority to abolish said district pursuant to Section 37-17-13, the district's board and the superintendent no longer exist."  2009 WL 367647 (Miss. A.G.).

1

Judgment and Complaint for Discovery.  After Petitioners motioned for temporary injunctive relief -- blocking their pending extinction until after this Court had an opportunity to hear Petitioners' claim -- the Court notified the parties it would like briefing on Petitioners' motion.

Before the Court set a briefing schedule for the motion, Respondent Jonathon Tate Reeves signed a proclamation, effectively dissolving the Holmes County Consolidated School District (HCCSD) and abolishing the Board of Trustees (Board) and Superintendent, Dr. Debra Powell.  (Prior to the governor's proclamation, SBE determined it would abolish the Board and Superintendent upon execution of the governor's proclamation declaring a state of emergency in HCCSD.).  Respondents' counsel all but conceded the proclamation extinguished Petitioners, eviscerating their right to move forward with their asserted constitutional claims.

This Court should not allow Respondents to abolish the Board and Superintendent after they have properly asserted their due-process rights before this Court.

## FACTUAL BACKGROUND

The Mississippi Department of Education (MDE) entered HCCSD on April 27, 2021, ostensibly to conduct an "on-site" investigative audit.   While MDE was there, conducting the audit, it posted an employment opportunity for "Educ-Associate Superintendent (Non-State Service) District Transformation Superintendent", offering a maximum salary of $191,842.42. (Notice, attached to Mot. as Exhibit A).  According to the posting, the job focused on ensuring the success of a District of Transformation.[2]  *Id*.  That job posting closed on July 21, 2021, two

---

[2]      According to the Mississippi Public School Accountability Standards (2020) (the Standards; individually, standard) -- after the governor declares a state of emergency in a district -- the State Board of Education is given sole authority to convert a school district into a district of transformation.  *See* MISS. CODE § 37-17-6.

days before MDE left HCCSD and five days before MDE provided to HCCSD its audit findings and recommendations.  *See id*; (July 26, 2021 Correspondence, attached to Mot. as Exhibit B).

On July 23, 2021, MDE exited HCCSD.  MDE violated its own accountability policies when it left HCCSD without conducting an exit interview.  *See* Standard 5.2.3.5 ("Near the completion of the on-site investigation, the auditor(s) will schedule a time to meet with the superintendent and school board chair to conduct an exit conference.").

On July 26, 2021 MDE delivered to HCCSD a letter and a 372-page audit report, detailing myriad allegations and violations, some of which were patently false.  *See* Exh. B.  The letter notified HCCSD that MDE would present its recommendations to (1) find that an extreme emergency situation existed in HCCSD, and (2) abolish HCCSD, its Board, and Superintendent, to the State Commission on School Accreditation (CSA) in less than a week on August 2, 2021.

Pursuant to the Standards, at the hearing before the CSA on August 2, 2021, HCCSD was allowed forty minutes only to respond to MDE's voluminous audit report.  During that time, HCCSD's counsel was not allowed to speak, and counsel's time to address the CSA was limited to a ten-minute closing statement.  The Standards provide no guidance as to the legal standard CSA would use to make its determination on MDE's recommendations.  No guidance was provided at the hearing, either.

At the conclusion of the hearing, CSA adopted MDE's recommendation, submitting same to SBE.

On August 3, 2021, SBE conducted a hearing, following the same process as CSA.  Less than an hour after that hearing concluded, MDE continued its undefeated streak of having SBE's

approval of its recommendations to declare a state of emergency and abolish a school district.[3]
(In recent history, upon information and belief, MDE has not even lost the vote of one CSA or
SBE member.).

It did so after a hearing in which SBE and MDE did not even try to hide their bias and
blatant coordination.  By way of one example, SBE's chair, Rosemary Aultman, conversed with
the State Superintendent of Education, Dr. Carey Wright, throughout the hearing, after which --
on occasions -- Dr. Wright speaking with MDE employees and reporting back to Aultman.  *See,
e.g.*, https://www.youtube.com/watch?v=VUAI3Js5ml8&t=17288s (Hearing Livestream), at
2:22:15 – 2:24:14 (after brief conversation with Mrs. Aultman, Dr. Wright immediately delivers
a message to Dr. Paula Vanderford, MDE's Chief Accountability Officer, who immediately
leaves the hearing and returns a minute later).

At the conclusion of the hearing, SBE went into executive session without stating a basis
for doing so.  After a brief deliberation, lasting less than one hour, SBE not only accepted
MDE's recommendations, but named an interim superintendent and offered her an employment
contract.  No one not in that executive session will know how SBE's "deliberation" time was
allocated between actual deliberations, identifying an interim superintendent, and negotiating her
employment contract.  (Obviously, the latter two events happened before the August 3, 2021,
hearing).

On August 4, 2021, Petitioners filed a Verified Petition for Injunctive Relief, Declaratory
Judgment and Complaint for Discovery.  [Doc. 1].  After their case was assigned a case number,
Petitioners filed an Urgent and Necessitous Motion for Temporary Restraining Order on the

---

[3]      MDE has a better win percentage than The Undertaker at WrestleMania.  But, 'Taker was a lot
better at not breaking kayfabe.

4

morning of August 5, 2021.  [Doc. 2].  Counsel notified known counsel for Respondents of the Emergency Petition and Motion at 10:26 A.M.

At 11:58 A.M., the Court directed Petitioners to give notice to Respondents' known counsel, indicated it wanted briefing on the issues raised in the TRO motion, and asked the parties to agree to a briefing schedule.  Counsel and a representative for the Attorney General's office agreed to a briefing schedule.

At 1:25 P.M., the governor -- despite the Court's request for briefing -- issued a proclamation, dissolving HCCSD and abolishing the Board and Superintendent.

Although the governor issued his proclamation on August 5, 2021 (and HCCSD experienced a COVID outbreak) -- as of August 9, 2021, the interim superintendent, despite the apparent "extreme emergency", had not assumed her duties, leaving HCCSD leaderless, even in the face of a health crisis.

## ARGUMENT

I.  **The Long-Standing All Writs Act Is a Well-Established Tool for A District Court to Preserve Its Jurisdiction Over A Matter In Which A Petitioner Asserts Claim to Protect a Right Guaranteed By the United States Constitution.**

The All Writs Act -- currently codified at 28 U.S.C. §1651 (1948) -- is a "legislatively approved source of procedural instruments designed to achieve the rational ends of law" that may be relied upon by courts "in issuing orders appropriate to assist them in conducting factual inquiries." *Harris v. Nelson*, 394 U.S. 286, 299 (1969) (cleaned up); *see also ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) (The Act "empowers a federal court to employ procedures necessary to promote the resolution of issues in a case properly before it"). The Act -- which was first passed as a part of the Judiciary Act of 1789 -- is almost as old as the

United States Constitution.  Although the Act has been amended several times, the substance thereof has not changed significantly from its original form.

In pertinent part, the Act provides:

[A]ll courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

28 U.S.C. § 1651(a).

The Act gives District Courts "one of the most potent weapons in the judicial arsenal": the writ.  *Chaney v U.S. Dist. Court for D.C.* 542 U.S. 367, 380 (2004) (cleaned up).  Using the writ, District Courts have wide latitude to craft "any remedy necessary to achieve justice." *U.S. v. Javanmard*, 767 F. Supp. 1109, 1111 (D. Kan. 1991) (internal quotation omitted); *see also Fla. Med. Ass'n, Inc. v. U.S. Dept. of Health, Educ. & Welfare*, 601 F.2d 199, 202 (5th Cir. 1979) ("the All Writs Act empowers a district court to fashion extraordinary remedies when the need arises."[4]).  A writ is appropriate where a District Court must preserve or exercise its subject matter jurisdiction, whether by conducting factual inquiries or curbing conduct that threatens to impede or defeat the court's jurisdiction.  *See Barton*, 569 F.2d at 1359.  A writ can protect already-conferred jurisdiction as well as prospective jurisdiction.  *Telecomms. Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 76 (D.C. Cir. 1984).  The Act also gives federal courts "power to preserve existing conditions while determining the authority to grant injunctive relief." *Application of President & Dirs. of Georgetown Coll., Inc.*, 331 F.2d 1000, 1005 (D.C. Cir. 1964) (internal quotations omitted).

---

[4] A District Court may even issue a writ against individuals "who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate . . . the proper administration of justice and encompasses even those who have taken an affirmative action to hinder justice." *U.S. v. N.Y. Tel., Co.*, 434 U.S. 159, 174 (1977) (citations omitted).

6

A writ is valid if it is directed toward conduct that would diminish a federal court's ability to bring litigation to a natural conclusion if not addressed by the writ. *Barton,* 569 F.2d at 1359.

Contrary to Respondents' assertion at the August 6, 2021, status conference -- this Court may issue a writ, compelling the Governor[5] to rescind his proclamation. *See, e.g.*, *Young*, 209 U.S. at 167 ("**[E]njoining [] state officers from enforcing an unconstitutional act, is not of a radical nature**, and does not extend, in truth, the jurisdiction of the courts over the subject-matter.") (emphasis added); *Harris v. Gibson*, 322 F.2d 780, 782 (5th Cir. 1963) (relying on § 1651 to enjoin a local board of education and its members, and the superintendent of schools from refusing to admit African-American students); *Hoffman v. Stump*, 172 F.3d 48, at *6 (6th Cir. 1998) ("Although the federal court may not compel a state officer to enforce state rights, **it may issue a writ of mandamus ordering a state official to enforce rights protected by federal law**.") (emphasis added); *State ex rel. Skaggs v. Brunner*, 588 F. Supp. 2d 828, 833 (S.D. Ohio 2008) ("**[A] federal court may issue a writ of mandamus ordering a state official to enforce rights protected by federal law**.") (emphasis added).

This is so, because state officials, like the Governor, may not infringe on Petitioners' due-process rights pursuant to an unconstitutional process, statute, or law. *See Young*, 209 U.S. at 167.

---

[5] Over 113 years ago, the United States Supreme Court -- in an often-cited case --found federal courts may enjoin a state official from violating the United States Constitution. *See Ex Parte Young*, 209 U.S. 123, 167 (1908) (enjoining state attorney general from filing suit, enforcing a state law that allegedly unconstitutional); *see generally Edelman v. Jordan*, 415 U.S. 651, 664 (1974) (finding that federal courts may enjoin a state official from taking action that allegedly violates federal law).

**II.     Petitioners Are Entitled To Procedural Due Process Before They May Be Abolished.**

"To state a Fourteenth Amendment due process claim . . . a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest." *Gentilello v. Reg*e, 627 F.3d 540, 544 (5th Cir. 2010) (internal quotations omitted).  A property interest is derived from state law, a contract, or other understanding.  *Stem v. Gomez*, 813 F.3d 205, 210-211 (5th Cir. 2016). "Once granted, a property interest cannot be deprived without due process of law." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  Each Petitioner has a cognizable due-process interest in their continued existence.

Dr. Powell has a property interest in her now terminated contract. *See Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1530 (5th Cir.1993) ("[A] teacher employed under the terms of a fixed term contract as defined by [state law] has a constitutionally protected property interest in employment until the term of the contract has expired."); *Markwell v. Culwell*, 515 F.2d 1258, 1259 (5th Cir.1975) (holding property interest limited to "year-to-year contract"); *Harris v. Canton Separate Pub. Sch. Bd. of Educ.*, 655 So.2d 898, 902 (Miss.1995) (holding that principal's fixed-term contract created constitutionally protected property interest for remainder of the term).  *See generally Greene v. Greenwood Pub. Sch. Dist.*, 890 F.3d 240, 242 (5th Cir. 2018).

Board members -- as elected officials entitled to hold office under state law -- have a property interest in their office.  *See Gordon v. Leatherman*, 450 F.2d 562, 565 (5th Cir. 1971); *Bishop v. Wood*, 426 U.S. 341, 344-45 (1976).  They have other property interests.

None of their property interests may be extinguished by procedures that do not meet the requirements of procedural due process.  *See Gordon*, 450 F.2d at 565.

The procedural due process "concept "imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (internal quotations omitted). The protection provided by procedural due process is not uniform or rigid; the extent of the protection is based on the interest being extinguished. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (holding that due process is "flexible and calls for such procedural protections as the particular situation demands."); *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (noting that due process "is not a technical conception with a fixed content unrelated to time, place and circumstances.") (internal citations omitted); *Caine v. Hardy*, 943 F.2d 1406, 1411-12 (5th Cir. 1991).

To determine the level of due-process protection a party should be extended, the Court should consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

## III.  Petitioners Are Entitled to Writ of Mandamus, Ordering the Governor To Rescind His Unconstitutional Proclamation.

Issuance of a writ is appropriate where:

(1) Petitioners have no other means to obtain their requested relief;

(2) Petitioners "satisfy the burden of showing that [their] right to issuance of the writ is clear and undisputable"; and

(3) the federal court determines the writ is appropriate under the circumstances.

*See Chaney*, 542 U.S. at 380-81 (internal quotations omitted).  All three conditions are featured herein.

A.  <u>The Petitioners Have No Other Means To Obtain the Relief Requested.</u>

There is one point upon which the Parties cannot disagree.  If this Court does not issue a writ, granting the relief requested by Petitioners, Petitioners will cease to exist.

In pertinent part, Mississippi Code § 37-17-6(12)(b) (Rev. 2017) provides:

> If [SBE] and [CSA] determine that an extreme emergency situation exists in a school district that jeopardizes the safety, security or educational interests of the children enrolled in the schools in that district and that emergency situation is believed to be related to a serious violation or violations of accreditation standards or state or federal law . . . [SBE] may request the [g]overnor to declare a state of emergency in that school district.

Section 37-17-13 states:

> Whenever the [g]overnor declares a state of emergency in a school district in response to a certification by [SBE] and [CSA] made under Section 37-17-6(12)(b), SBE, in addition to any actions taken under Section 37-17-6, may abolish the school district and assume control and administration of the schools formerly constituting the district, and appoint an interim superintendent to carry out this purpose under the direction of the [SBE]. In such case, [SBE] shall have all powers which were held by the previously existing school board, and the previously existing superintendent of schools . . . and the authority to request tax levies from the appropriate governing authorities for the support of the schools and to receive and expend the tax funds.

*See also* Standard 2.9.2 (2020).  After the governor a state of emergency in a school district and [SBE] abolishes said district, the district's board and the superintendent no longer exist."  2009 WL 367647 (Miss. A.G.).

Neither the Board nor Dr. Powell have any recourse after they are abolished.

It is worth noting a number of Mississippi statutes provide more procedural-due-process protections for less Draconian punishments than abolition of a local board and superintendent.  For example, "[a]ll controversies involving the accreditation of schools shall be initially heard by a duly authorized representative of the [CSA]" MISS. CODE § 37-17-5 (2021). A "complete record"

of the hearing must be made. *Id.* At the conclusion of the hearing, the representative must make a recommendation to the CSA, which the CSA must consider, along with the record, to reach its conclusion. *Id.* If the district disagrees with the CSA's conclusion, it may appeal it to the SBE. *Id.* If aggrieved by the SBE's conclusion, the district may appeal to the Circuit Court of the First Judicial District of Hinds County. *Id.*

After a terminated teacher or principal requests a termination hearing, they are entitled to hearing that is subject to judicial review. *See* MISS. CODE § 37-9-111 (2021).  Section 37-9-111 prescribes (1) a deadline for conducting the hearing; (2) clear restrictions on who may conduct the hearing; (3) the ability to present witnesses and other evidence pertinent to the issues; (4) the right to cross-examine witnesses presented at the hearing; and (5) the power to subpoena witnesses. Once this hearing is complete, the aggrieved employee can appeal the decision to the chancery court of the judicial district in which the school district is located, according to the procedure set forth in § 37-9-113.

Section 37-17-6 provides none of those safeguards.

B. Petitioners' Right To A Writ is Clear.

    1. *Respondents Were Biased Against Petitioners Prior To Its Hearing.*

"Procedural due process considers not the justice of a deprivation, but only the means by which the deprivation was effected." *Wheeler v. Williams*, Civ. Action No. 4:17-cv-96-SA-JMV, 2018 WL 6204444, *5 (N.D. Miss. Nov. 27, 2018) (citing *Bowlby v. Aberdeen, Miss.*, 681 F.3d 215, 222 (5th Cir. 2012).  Hence, the determination of whether Petitioners' procedural due process rights were violated is not based the CSA's or SBE's approval of MDE's recommendation to abolish the Board and Superintendent; but whether that approval was based a process that afforded Petitioners sufficient process.  *See id.*

A biased decisionmaker is anathema to the concept of procedural due process under any standard. *See Marlboro Corp. v. Ass'n of Indep. Colleges & Sch., Inc.*, 556 F.2d 78, 82 (1st Cir. 1977). Stated slightly differently, "Not only is a biased decisionmaker constitutionally unacceptable but our system of law has always endeavored to prevent even the probability of unfairness". *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). The requirement of impartiality applies in proceedings before administrative agencies, like SBE. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir.1997). "Bias can be shown by a finding that the adjudicator prejudged the issues or had a pecuniary interest in the subject of the action." *All Amer. Check Cashing, Inc. v. Corley*, 191 F. Supp. 3d 646, 663 (N.D. Miss. 2016).

Petitioners state a colorable due-process claim by asserting facts that suggest the CSA or SBE were biased. *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 511 (5th Cir. 2001) (citing *In re Murchison*, 349 U.S. 133, 136 (1955)); *see also Corley*, 191 F. Supp. 3d at 662 ("It is a fundamental precept of due process that those responsible for decisions which affect an individual's property and/or liberty interests must be impartial."). *See generally Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57, 61-62 (1972) ("Nor ... may the State's ... procedure be seemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral detached judge in the first instance"); *United Church of the Medical Ctr. v. Medical Ctr. Comm'n.*, 689 F.2d 693, 701 (7th Cir. 1982) (explaining that "[s]ubmission to a fatally biased decisionmaking process is in itself a constitutional injury" which is not cured by "judicial review of [the] biased state administrative proceedings, even if on a *de novo* basis").

SBE's conduct demonstrates HCCSD's hearing was, at best, a perfunctory farce where the outcome was determined well-before the Board and Dr. Powell were allowed to make their

12

case.  MDE (and potentially SBE) had Dr. Powell replacement waiting in the wings as early as July 21, 2021, when the job posting for an interim superintendent closed.  That job posting closed two days before MDE concluded its audit, violating its own Standards by failing to give Dr. Powell and her staff an exit interview, and five days before HCCSD received MDE's audit report.  The fact SBE identified and drafted a contract for Dr. Powell's replacement (before she left the building after the SBE hearing) **in less than one hour** is clear evidence the decision to abolish the Board and Superintendent before the SBE hearing began.

Further evidence of SBE's bias was on display during the hearing, which was nothing more than a scripted, coordinated attack on the Board and Superintendent.  SBE's chair, had conversations with the superintendent of education about which there are indicia of biased coordination.  *See, e.g.*, Hearing Livestream, at 2:20:00 - 2:21:00 (following conversation between Aultman and Dr. Wright, Dr. Wright leaves to have closed-door discussion with Dr. Vanderford); *id.* at 2:22:15 – 2:24:14 (following a second conversation with Aultman, Dr. Wright met with Dr. Vanderford again; this time Dr. Vanderford immediately leaves the hearing and returns a minute later).

Another evidence of coordination is demonstrated by SBE's questioning Dr. Powell regarding HCCSD's relationship with state universities.  During the hearing, Dr. Powell described several partnerships with state universities to address teacher-certification issues.  Dr. Powell was asked about the partnerships during the question-and-answer session where she confirmed the existence of the partnerships.  Immediately after receiving Dr. Powell's response, **MDE presented Dr. Debra Burson to mislead SBE and misrepresent the status of the partnerships**.  *See* Hearing Livestream, at (2:58:40 -3:00:11).  Contrary to Dr. Burson's false

assertions, Petitioners' Verified Petition provides clear evidence the HCCSD had several relationships with state universities.

SBE members also asked questions that served no other purpose than as a not thinly veiled attempt to embarrass the Board and Superintendent.  SBE's chair questioned Dr. Powell regarding errors on the HCCSD's website.  *E.g.*, Hearing Livestream, at 2:06:27-2:07:36 (chair appearing to know the website was erroneous).  Another SBE member asked the Board chair to name the school superintendent going back to before the HCCSD was created.  *Id.* at 2:24:25 - 2:24:45.  The Board chair was even asked whether she was aware she was personally on the hook for misappropriated funds.  *Id.* at 2:28:58 -2:29:10.  Before the Board chair could respond, Aultman baldly concludes the Board was dilatory in executing its duties.  *Id.* at 2:29:10 - 2:32:16.

Petitioners believe that additional discovery will reveal that throughout the hearing, SBE members communicated with MDE during the hearing to make the case for abolishing HCCSD's Board and Superintendent

Lastly, SBE has a financial incentive in abolishing the Board and Supervisor, demonstrating further bias.  *See generally  Ward*, 409 U.S. at 59–60, 93 S.Ct. 80 (holding that village mayor was not disinterested and impartial judicial officer in petitioner's trial on traffic offenses where mayor was responsible for village finances, and mayor's court, through fines, forfeitures, costs and fees, provided a substantial portion of the village funds); *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 147 (1st Cir. 2008) (finding that where state board that would adjudicate claim had "complete discretion" over the use of funds supplied by the fines it imposed and the $76 million proposed fine was "so unprecedented and extraordinarily large," "the possibility of temptation is undeniable and evident"); *United Church*, 689 F.2d at 699

(finding that state commission had pecuniary interest in the outcome of reverter proceedings sufficient because "if the commission finds a nonuse or disuse, the property reverts to the commission without cost to the Commission").

SBE's chair acknowledged during the hearing, upon the Board's and Superintendent's abolition, SBE would gain control of approximately $31,000,000 in funds due to HCCSD. *See* Hearing Livestream, at (57:35-57:55)

2.    *Mississippi Code § 37-18-6 (12)(b) Is Unconstitutional.*

Section § 37-18-6(12)(b) provides none of the protections afforded by procedural due process. It lacks (1) a standard of proof, (2) an unbiased, fair panel of decisionmakers; (3) adequate time to prepare a meaningful response; and (4) the ability to question witnesses. *See generally Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597, 609-12 (S.D. Miss. Jan. 16, 2019). Petitioners have already addressed the second element, so they will not rehash those arguments here.

As an initial matter, the amount of procedural due process Petitioners should be afforded prior to their abolition. In making that determination, federal courts consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335; *see also Doe*, 361 F. Supp. 3d at 609. As set forth above, the Board and Dr. Powell have clear property interest, the denial of which will impact their lives on myriad fronts (financially, employability, and reputationally to name just a few). Petitioners are entitled to heighten protections under the Due Process Clause. Abolition of the Board and

Superintendent is the most severe punishment SBE may mete out, robbing the Holmes County

taxpayers of their right to control their tax revenue[6] and schools.

       i.     *Section 37-17-6 (and the Standards) do not specify what standard of proof applies to determine whether an extreme emergency situation exists in a school district.*

Instead of providing a standard of proof, § 37-17-6(12)(b) poses an overly broad,

subjective inquiry: whether "an extreme emergency situation" exists "in the school district that

jeopardizes the safety, security, and educational interests of the children and" it is believed "the

emergency situation is related to a serious violation or violations of accreditation standards or

state or federal law or failure to meet academic standards as evidenced by a continued pattern of

poor student performance." *See* MISS. CODE § 37-17-6(12)(b). That question is repeated in the

Standard.  But no standard of proof is articulated.

This Court has noted that -- in circumstances like this where the allegations are quasi

criminal (as shown above, SBE's chair indicated Board members may be personally liable for

the mismanagement of funds)-- a heighten clear and convincing standard of proof  may be

required.  *Doe*, 361 F. Supp. 3d at 613-14.  Here, there is no standard at all.

In fact, the standard was a moving, sometimes contradictory, target throughout the SBE

hearing.  MDE began it presentation by citing the statutory language. *See* Hearing Livestream, at

40:25:00. But then, the Office cited factors supporting the declaration of an extreme emergency

situation -- without providing any citation of authority. *Id.* at 40:55:00. The cited factors are

nowhere to be found in § 37-17-6, the Standards, or in the July 26, 2021 letter, enclosing the

audit report.  To further confuse the issue, MDE also turned to Accreditation Policy 2.5.2, which

---

[6]     There are also substantive bases for challenging the constitutionality of § 37-17-6.

sets forth nine violations MDE characterized as major. *Id.* at 41:20:00 – 41:39:00. (Yet, in the same breath, MDE stated it was not challenging the HCCSD's accreditation. *Id.* at 41:40:00 – 41:57:00).

At no point prior to, or during, was a standard of proof articulated.   In the absence of a standard, Petitioners have asserted a valid due-process claim.  *See generally Doe*, 361 F. Supp. 3d at 613-14.

> ii.  *Section 37-17-6 does not provide adequate time to prepare a meaningful response.*

Section 37-17-6 gives MDE unlimited discretion to set the date of the hearing before CSA and SBE, despite the fact MDE recognizes a reasonable response period.  *See* Standard 5.8.2.  That period is far longer than the six days Petitioners were given to respond to a two-month audit and 372-page audit report, alleging 26 violations.  Petitioners had no prior notice, because they were not afforded an exit conference in violation of Standard 5.2.3.5.  That six days was not sufficient time to prepare a response to the audit report, much less prepare for two hearings that would determine whether the Board, the District, and Superintendent were abolished.

"The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending hearing." *Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 15 (1978) (internal quotations omitted); *see also Burns v. Harris Cnty. Bail Bond Bd.*, 139 F.3d 513, 521 (5th Cir.1998) (citation and internal quotations omitted).

Six-days' notice does not provide sufficient time for a party to adequately investigate 372 pages of factual findings or prepare a response to the same—a response on which the existence of an entire school district relied.

On a related note, MDE provided its audit report to CSA and SBE several days, if not weeks, before the hearing.  Under Section 37-17-6, Petitioners were not afforded the same privilege.  Petitioners could not present their materials until the date of the hearing, giving CSA and SBE mere minutes to review those materials before Petitioners began their presentations.

Due Process demands more.

> iii.   *Section 37-17-6 (and the Standard) does not afford an opportunity to cross examine witnesses.*

"In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).  As a matter of right, given the serious nature of abolition of the Board and Superintendent, § 37-17-6 should afford Petitioners an opportunity to cross examine witnesses.  *See generally Doe*, 361 F. Supp. 3d at 612 (noting Sixth Circuit's finding that an accused should have the right to cross examine adverse witnesses "in the most serious of cases") (internal quotations omitted).

Because Petitioners could not cross examine witnesses at the two hearings, numerous material representations from CSA and SBE representation went unchallenged.  For example, MDE told SBE that placing HCCSD on probation "would have no teeth", Hearing Livestream, at 3:07:15-3:09:44.  Nothing could be further from the truth.  *See* Standard 2.8, et al.  Further Petitioners believe that discovery will reveal that abolition of the Board and Superintendent was the only option presented to the SBE with no consideration of any alternatives.  Again, this ignores the variety of options available in lieu or abolition.  *See* Standard 2.9.1 (clearly giving SBE discretion).

As soon earlier MDE was also allowed to make material representations, like false asserting HCCSD did not have relationship with state universities, when it is crystal clear that

they did.  Similarly, in the prior day's hearing, MDE denied any affiliation with Debbie Jones,

the MDE appointed financial advisor specifically in charge of preparing financial protocols for

which HCCSD is being cited.

Had Petitions been afforded an opportunity to cross examine witnesses, under oath, some

of MDE's misrepresentations could have been addressed.

Facing extinction, the Board and Dr. Powell are entitled to cross examine witnesses more

so than a school facing a downgraded accreditation, *see generally* MISS. CODE § 37-17-5 or a

terminated employee of the school district. *See generally* MISS. CODE § 37-9-111.

   3.    *SBE's Violation of the Open Meetings Act Was Unconstitutional.*

Official meetings of public bodies are required to be public and open.  The Open

Meetings Act states:

> It being essential to the fundamental philosophy of the American constitutional
> form of representative government and to the maintenance of a democratic society
> that public business be performed in an open and public manner, and that citizens
> be advised of and be aware of the performance of public officials and the
> deliberations and decisions that go into the making of public policy, it is hereby
> declared to be the policy of the State of Mississippi that the formation and
> determination of public policy is public business and shall be conducted at open
> meetings except as otherwise provided herein.

MISS. CODE ANN. § 25-41-1 (Rev. 2010). The Act provides sets forth "that all deliberations,

decisions and business of all governmental boards and commissions, unless specifically excluded

by statute, shall be open to the public." *See Hinds Cty. Bd. of Supervisors v. Common Cause of*

*Mississippi*, 551 So. 2d 107, 110 (Miss. 1989).

Section 25-41-7 sets for limited exceptions to the requirement for open and public

meetings:

> (1)    Any public body may enter into executive session for the transaction of
> public business; provided, however, all meetings of any such public body shall
> commence as an open meeting, and **an affirmative vote of three-fifths (3/5) of**
> **all members present shall be required to declare an executive session**.

(2)      The procedure to be followed by any public body in declaring an executive session shall be as follows: Any member shall have the right to request by motion a closed determination upon the issue of whether or not to declare an executive session. Such motion, by majority vote, shall require the meeting to be closed for a **preliminary determination of the necessity for executive session**. No other business shall be transacted until the discussion of the nature of the matter requiring executive session has been completed and **a vote, as required in subsection (1) hereof, has been taken on the issue.**

(3)      **An executive session shall be limited to matters allowed to be exempted from open meetings by subsection (4) of this section. The reason for holding such an executive session shall be stated in an open meeting, and the reason so stated shall be recorded in the minutes of the meeting.** Nothing in this section shall be construed to require that any meeting be closed to the public, nor shall any executive session be used to circumvent or to defeat the purposes of this chapter.

(4)      A public body may hold an executive session pursuant to this section for one or more of the following reasons:

(a) Transaction of business and discussion of personnel matters relating to the job performance, character, professional competence, or physical or mental health of a person holding a specific position.

(b) Strategy sessions or negotiations with respect to prospective litigation, litigation or issuance of an appealable order when an open meeting would have a detrimental effect on the litigating position of the public body.

(c) Transaction of business and discussion regarding the report, development or course of action regarding security personnel, plans or devices.

(d) Investigative proceedings by any public body regarding allegations of misconduct or violation of law.

(e) Any body of the Legislature which is meeting on matters within the jurisdiction of such body.

(f) Cases of extraordinary emergency which would pose immediate or irrevocable harm or damage to persons and/or property within the jurisdiction of such public body.

(g) Transaction of business and discussion regarding the prospective purchase, sale or leasing of lands.

(h) Discussions between a school board and individual students who attend a school within the jurisdiction of such school board or the parents

or teachers of such students regarding problems of such students or their parents or teachers.

(i) Transaction of business and discussion concerning the preparation of tests for admission to practice in recognized professions.

(j) Transaction of business and discussions or negotiations regarding the location, relocation or expansion of a business or an industry.

(k) Transaction of business and discussions regarding employment or job performance of a person in a specific position or termination of an employee holding a specific position. The exemption provided by this paragraph includes the right to enter into executive session concerning a line item in a budget which might affect the termination of an employee or employees. All other budget items shall be considered in open meetings and final budgetary adoption shall not be taken in executive session.

(l) Discussions regarding material or data exempt from the Mississippi Public Records Act of 1983 pursuant to Section 25-11-121.

(5) **The total vote on the question of entering into an executive session shall be recorded and spread upon the minutes of such public body.**

(6) Any such vote whereby an executive session is declared shall be applicable only to that particular meeting on that particular day.

MISS. CODE ANN. § 25-41-7 (emphasis added).

Respondents violated the Mississippi Open Meeting Act. Not only did they not follow the procedures for going into an executive session, their deliberations regarding the Board's and Superintendent's existence did not fall into an identified exception. Respondents did not even try to articulate any reason for going into executive session, much less a valid one.

It is also apparent that the executive session involved more than discussions regarding the purported MDE's recommendation to declare an emergency. (Ironically, violation of the Mississippi Open Meetings Act could result in a violation of one of the nine process standards which warrants withdrawal of a school district's accreditation).

C. <u>A Writ Is Appropriate Here.</u>

The All Writs Act was enacted to address situation like this.  Respondents took action soon after receiving notice of Petitioners filings, frustrating the jurisdiction of this Court and eviscerating Petitioners' claims, even though they did not take any substantive action until 5 days later.

The All Writs Act was designed to curb Respondents' conduct here.  Specifically, a writ is appropriate here to preserve its subject matter jurisdiction to conduct a factual inquiry into Petitioners' asserted claims.  *See Barton*, 569 F.2d at 1359.  A writ would protect this Court's subject-matter jurisdiction. *See Telecomms. Research*, 750 F.2d at 76.  Further, issuance of a write would preserve the status quo while the Court determines its authority to grant the injunctive relief Petitioners seek.  *See Georgetown Coll., Inc.*, 331 F.2d at 1005.

The writ would be valid; it would be directed toward conduct that diminishes this Court's ability to bring litigation to a natural conclusion.  *See Barton,* 569 F.2d at 1359.

## CONCLUSION

For the reasons set forth herein, the Court should order the governor to rescind his August 5, 2021 proclamation or for any other relief the Court deems appropriate.

RESPECTFULLY SUBMITTED, this the 10th day of August, 2021.

/s/ Clarence Webster, III
Clarence Webster, III (MS Bar No. 102111)
Michael C. Williams (MS Bar No. 104537)
Stevie F. Rushing (MS Bar No. 105534)

**ATTORNEYS FOR PETITIONERS**

OF COUNSEL:

BRADLEY ARANT BOULT CUMMINGS LLP
Suite 1000, One Jackson Place
188 East Capitol Street
Post Office Box 1789
Jackson, Mississippi 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
cwebster@bradley.com
srushing@bradley.com
mcwilliams@bradley.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused the foregoing pleading to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record and registered participants.  Counsel will email this filing to known counsel.

THIS, the 10th day of August, 2021.

/s/ Clarence Webster, III
CLARENCE WEBSTER, III